**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

---------------------------------------------------

JENNIFER FULWILER &
TROY FULWILER,
606 River Side Dr.
Pasadena, MD 21122

        Plaintiffs,

v.

NEWREZ, LLC d/b/a/ SHELLPOINT
SERVICING,
*Serve:*
CSC-Lawyers Incorporating Service Company
7 St. Paul St., Ste. 820
Baltimore, MD 21202

EXPERIAN INFORMATION SOLUTIONS,
INC.,
*Serve:*
The Corporation Trust, Inc.
2405 York Rd., Ste. 201
Lutherville Timonium, MD 21093

TRANS UNION LLC,
*Serve:*
CSC-Lawyers Incorporating Service Company
7 St. Paul St., Ste. 820
Baltimore, MD 21202

and

EQUIFAX INFORMATION SERVICES,
LLC,
*Serve:*
CSC-Lawyers Incorporating Service Company
7 St. Paul St., Ste. 820
Baltimore, MD 21202

        Defendants.

---------------------------------------------------

Civil Action No.:
**JURY TRIAL DEMANDED**

**COMPLAINT**

COMES NOW the Plaintiffs Jennifer and Troy Fulwiler, by and through their undersigned counsel of record, and alleges the following against Defendants NEWREZ, LLC d/b/a SHELLPOINT SERVICING ("Shellpoint"), EXPERIAN INFORMATION SOLUTIONS, INC., ("Experian"), TRANS UNION, LLC ("Trans Union"), and EQUIFAX INFORMATION SERVICES, LLC ("Equifax").

**INTRODUCTION**

1.     This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq*. ("FCRA"); and the Real Estate and Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 ("RESPA").

2.     In response to the ongoing COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116–136, ___ Stat. ___ (2020) ("CARES Act").  As part of this relief, consumers are allowed to request forbearance on their mortgages because of financial hardship due to the COVID-19 emergency.

3.     The CARES Act also amended the Fair Credit Reporting Act to require that, if a creditor made an "'accommodation' to defer one or more payments" during the COVID-19 pandemic, the creditor "shall report the credit obligation or account as current" during the period of forbearance.  In other words, if a consumer's account was current at the time the consumer received a forbearance, the mortgage servicer must report the account as current during the forbearance period.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Plaintiffs' Fair Credit Reporting claims under 28 U.S.C. § 1331, 15 U.S.C. § 1681p, and 12 U.S.C. §§ 2601-2617, which allow claims under the FCRA and RESPA to be brought in any appropriate court of competent jurisdiction.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## THE PARTIES

6.      Plaintiff Jennifer Fulwiler is a natural person who resides in Pasadena, Maryland and is a "consumer" protected by the FCRA.

7.      Plaintiff Troy Fulwiler is a natural person who resides in Pasadena, Maryland and is a "consumer" protected by the FCRA.

8.      Defendant NewRez, LLC d/b/a Shellpoint Mortgage Servicing is a foreign corporation headquartered in Pennsylvania and conducts business in the state of Maryland through its registered agent.

9.      Shellpoint is a "furnisher' of information as defined and governed by 15 U.S.C. § 1681s-2 and a "mortgage servicer" as defined by RESPA.

10.      Defendant Experian Information Solutions, Inc. is headquartered in California and conducts business in the state of Maryland  through its registered agent.

11.      Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

12.      Defendant Equifax Information Services, LLC is headquartered in Georgia and conducts business in the state of Maryland through its registered agent.

13.      Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f),and

it disburses consumer reports to third parties for monetary compensation.

14.     Defendant Trans Union, LLC is headquartered in Illinois and does business in the state of Maryland through its registered agent.

15.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

### THE CARES ACT, CREDIT REPORTING, AND PLAINTIFFS' FORBEARANCE PLAN

16.     As part of the CARES Act, Congress provided relief for those affected by the COVID-19 emergency with respect to mortgage payments due under federally backed mortgages.

17.     Section 4022(b) of the CARES Act provides that "a borrower with a Federally backed mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID–19 emergency may request forbearance on the Federally backed mortgage loan."  The borrower may do so by "(A) submitting a request to the borrower's servicer; and (B) affirming that the borrower is experiencing a financial hardship during the COVID–19 emergency."

18.     Upon receipt of a forbearance request, "such forbearance shall be granted for up to 180 days and shall be extended for an additional period of up to 180 days at the request of the borrower." *Id.*

19.     The CARES Act also amended the Fair Credit Reporting Act to ensure that consumers were not punished for electing forbearance.  Specifically, the FCRA as amended now provides:

> If a furnisher makes an accommodation with respect to 1 or more payments on a credit obligation or account of a consumer, and the consumer makes the payments or is not required to make 1 or more payments pursuant to the accommodation, the furnisher shall—
> (I)      report the credit obligation or account as current; or
> (II)     if the credit obligation or account was delinquent before the accommodation—

(aa)    maintain the delinquent status during the period in which the accommodation is in effect; and

(bb)    the consumer brings the credit obligation or account current during the period described in item (aa), report the credit obligation or account as current.

15 U.S.C. § 1681s-2(a)(1)(F).

### Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers

20.    "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

21.    "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

22.    Section 1681i(a), on the other, hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through a dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

23.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

24.     It has long been the law that a CRA, such as Experian, Trans Union, and Equifax, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

25.     That "grave responsibility" imposed by the FCRA reinvestigation

requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

26.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed. 2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

27.     Further, as the CRA Defendants are aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that the CRA Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

28.     It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

29.     Today, furnishers such as Shellpoint and other of the CRA Defendants' furnishers, have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2.  But while the CRA Defendants' duties under § 1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much recent, enacted on in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### The CRA Defendants Did Not and Do Not Conduct Any Investigation of Most Consumer Disputes

30.     Unknown to the Plaintiffs until this lawsuit, it has long been the practice of the CRA Defendants to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Both Equifax and Trans Union use the same vendor, previously known as Intelenet Global Services and now as Teleperformance. Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mailed disputes.

31.     These dispute processing vendors are not hired to perform an actual FCRA investigation.  Instead, the vendors' sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

32.     In fact, the CRA Defendants strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer must click one of just a few available dispute reasons (such as "Not my account.").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human

---

[1]  *Available at*  https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience– fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

eyes at Equifax, Trans Union, or Experian. It gets sent to the CRA Defendants' creditor customer (such as Nationstar) for its sole review and consideration.

33.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication.  That mailbox company receives consumer disputes, scans them into a batch of other disputes.

34.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

35.     Both Equifax and Trans Union then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

36.     Teleperformance and Experian Chile agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

37.     Equifax and Trans Union have both taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court just this year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are

employees of Equifax." *Miller v. Equifax Info. Serv*., Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

38.     Trans Union has taken and succeeded with this same position. *See, e,g.*, *Wilcox v. Servis One, Inc*., No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).[2]

39.     Regardless of whether these statements are correct, Equifax, Trans Union, and Experian believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

40.     Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiffs' many disputes.  Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *The CRA Defendants Forwarded Plaintiffs' Disputes to Shellpoint, Who Did Nothing*

41.     In each instance in which Plaintiffs disputed the Shellpoint account with the CRAs, the CRAs forwarded Plaintiffs' disputes to Shellpoint using an electronic system called "e-Oscar,"

---

[2] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in Virginia with Plaintiffs' Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.).

To the extent Experian would reverse course from *Sublett* and argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as he alleges against Equifax and TransUnion for their farming-out of investigations to Teleperformance.

which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to CRAs.

42.     e-Oscar is also the system by which Shellpoint has agreed it will accept such consumer disputes from the CRAs.

43.     Under such circumstances, Shellpoint became obligated under the FCRA to investigate Plaintiffs' disputes.

44.     Plaintiffs' disputes to Shellpoint in order to have Shellpoint reinvestigate their complaints went unanswered, as it continued to report the derogatory history regarding the Plaintiffs.

45.     Shellpoint failed to reinvestigate Plaintiffs complaints.

46.     The information furnished by Shellpoint to Equifax, Trans Union, and Experian was at all times inaccurate.

47.     On or about a date better known to Experian and Shellpoint, Experian furnished Plaintiffs' disputes to Shellpoint.

48.     Shellpoint failed to reasonably reinvestigate Plaintiffs' disputes that Shellpoint received from Experian in violation of § 1681s-2(b)(1)(A) of the FCRA.

49.     Defendant Shellpoint further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiffs' information after receiving Plaintiffs' disputes from Shellpoint and prior to the commencement of this action.

50.     On or about dates better known to Equifax and Shellpoint, Equifax furnished Plaintiffs' disputes to Shellpoint.

51.     Shellpoint failed to reasonably reinvestigate Plaintiffs' disputes that Shellpoint received from Equifax in violation of § 1681s-2(b)(1)(A) of the FCRA.

52.     Defendant Shellpoint further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiffs' information after receiving Plaintiffs' dispute from Equifax and prior to the commencement of this action.

53.     On or about a date better known to Trans Union and Shellpoint, Trans Union furnished Plaintiffs' disputes to Shellpoint.

54.     Shellpoint failed to reasonably reinvestigate Plaintiffs' disputes that Shellpoint received from Trans Union in violation of § 1681s-2(b)(1)(A) of the FCRA.

55.     Defendant Shellpoint further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiffs' information for a period of time after receiving Plaintiffs' dispute from Trans Union and prior to the commencement of this action.

56.     By its actions as described herein, Shellpoint furnished and communicated false credit information.

### DEFENDANT'S CONDUCT WAS WILLFUL

57.     The FCRA demands the CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report pursuant to 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it pursuant to 15 U.S.C. § 1681i.

58.     The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Shellpoint, particularly where a consumer makes a dispute about information reported.

59.     Also, when consumers like Plaintiffs dispute the accuracy of information through the agencies, those disputes are transmitted to the party furnishing the information, here Shellpoint. The FCRA demands that each party separately conduct a reasonable investigation of the

12

consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

60.     Plaintiffs bring claims under Section 1681e(b) against all three CRAs because each CRA reported inaccurate information about the Plaintiffs regarding their Shellpoint mortgage account. When Plaintiffs disputed these inaccuracies, the CRAs did not reasonably investigate, also violating Section 1681i.

61.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, SUPERVISORY HIGHLIGHTS CONSUMER REPORTING SPECIAL EDITION 21 (Issue 14, March 2, 2017). This is particularly true as to how the CRA Defendants have complied with their now 50-year-old obligation to conduct a meaningful accurate investigation. The CRA Defendants have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had they followed that advice and heeded those warnings, the Plaintiffs would not have been harmed.

62.     The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

63.     Proof of willfulness includes, for example, a lack of any internal procedures to anticipate or prevent inaccuracy. *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246, 253 (4th Cir. 2017).

64.     As detailed above, the FCRA section at issue here, and informative guidance, have been in place for over 50 years. The language of § 1681e(b) has not changed. The FCRA's caution of Defendant's "grave responsibilities" to ensure accuracy has not changed.

65.     Likewise, Shellpoint violated the FCRA, Section 1681s-2(b), when it received Plaintiffs' disputes from the CRAs and thereafter failed to reasonably investigate those disputes. Instead, discovery will show all that Shellpoint did was consult its own records about the account and confirm to the CRAs the inaccurate information it was already reporting.

66.     Plaintiffs further alleges claims against Shellpoint for its violations of RESPA, 12 U.S.C. §§ 2605(e) and (k). Plaintiffs disputed aspects of their mortgage account with Shellpoint, but it failed to meet its obligations under RESPA when Plaintiffs disputed.

### PLAINTIFFS DISPUTE THE INACCURACY OF SHELLPOINT'S CRA REPORTING

67.     Shellpoint services Plaintiffs' mortgage for a rental property in Brooklyn Park, Maryland.

68.     Shellpoint granted Plaintiffs a COVID Forbearance Plan from April 1, 2020 through September 30, 2021.  At the time Plaintiffs requested the forbearance, they were current on their mortgage.

69.     Following this, Plaintiffs started receiving notices regarding their forbearance plan. Shellpoint's February 23, 2021 notice to Plaintiffs included the following statement, "At this time, your loan is past due for the 05/01/2020 installment."

70.     Shellpoint's mortgage account records for Plaintiffs show that a late fee was assessed in the amount of $36.25 on May 1 2020, during the forbearance period.  The late charge was reversed by Shellpoint on June 11, 2020.

71.     On or around September 2021, Plaintiffs followed up with Shellpoint's customer service representatives who instructed and informed Plaintiffs on their loan obligations and modifications.

72.     In October 2021, Plaintiffs continued to follow up with Shellpoint's customer service representatives regarding their repayment obligations and modifications at the direction and confirmation of Shellpoint's customer service representatives.

73.     In early November 2021, Plaintiffs followed up with a Shellpoint loss mitigation representative who confirmed Plaintiffs' repayment obligations, modifications, and information under the loan modification including set up of Plaintiffs' automated payments to satisfy their loan obligations.

74.     After Plaintiffs' first payment, Shellpoint reported to consumer reporting agencies, Equifax, Experian, and Trans Union that the mortgage was 30 days past due with an outstanding balance of $17,576.00 for October 2021.

75.     In January 2022, Plaintiffs disputed Equifax's incorrect reporting of the Shellpoint mortgage payments.

76.     Equifax's dispute investigation dated January 9, 2022, concluded that its investigations confirmed that the 60-80 days past due notation regarding the Shellpoint tradeline.

77.     On or about January 21, 2022, Plaintiffs submitted a Complaint to the Consumer Financial Protection Bureau against Shellpoint regarding their inaccurate reporting of the payments on their home mortgage.

78.     On January 31, 2022, Shellpoint approved and offered Plaintiffs a Loan Modification.  As part of the modification paperwork, it included account information which showed there were no outstanding payments.

79.    On February 2, 2022, Shellpoint issued its response to Plaintiffs' Consumer Protection Bureau Complaint stating that its reporting was accurate.

80.    On February 8, 2022, Plaintiffs submitted a Complaint to the Consumer Financial Protection Bureau against Shellpoint regarding their inaccurate reporting of the payments on their home mortgage.

81.    Equifax's dispute investigation dated February 9, 2022, concluded that its investigations confirmed that the 30/60 days past due notations for October and November of 2021 were accurate and Equifax did not make any changes to Plaintiffs' consumer report regarding the Shellpoint tradeline.

82.    Plaintiffs disputed Equifax's incorrect reporting of the Shellpoint mortgage payments on February 10, 2022.

83.    On February 23, 2022, Plaintiffs satisfied their account obligations in accordance with the forbearance and Loan Modification program.

84.    On February 23, 2022, Plaintiffs received the Consumer Protection Bureau Response to Plaintiffs' Complaint against Shellpoint, which indicated that as of March 1, 2022 the Plaintiffs' loan was current.

85.    Equifax's dispute investigation dated March 2, 2022, concluded that its investigations confirmed that the negative Shellpoint reporting was accurate.

86.    Shellpoint's correspondence dated March 7, 2022, indicated that there were zero payments due at that time, other than the normally scheduled payment for April 1, 2022.

87.    Experian's March 8, 2022 dispute investigation results for the Shellpoint account confirmed a recent payment of $12,416, 30 days past due notation for October 2021, and 60 days past due notation for November 2021.  Despite Plaintiffs' dispute, Experian did not make any

changes, corrections, or updates to Plaintiffs' consumer file.  Including Experian's failure to mark the Shellpoint account as "disputed".

88.     Correspondence from Shellpoint on March 14, 2022 notes that the account was not delinquent within the past 24 months.

89.     Correspondence from Shellpoint on March 16, 2022 notes that the account was not delinquent within the past 24 months.

90.     Plaintiffs disputed Experian's incorrect reporting of the Shellpoint mortgage payments in mid-March 2022.

91.     Experian's dispute investigation results dated March 21, 2022 for the Shellpoint account included confirmation of a recent payment of $12,416, 30 days past due for October 2021, and 60 days past due for November 2021.  Despite Plaintiffs' dispute, Experian did not make any changes, corrections, or updates to Plaintiffs' consumer file and failed to mark the Shellpoint account as "disputed".

92.     Plaintiffs disputed Equifax's incorrect reporting of the Shellpoint mortgage payments in late March 2022.

93.     Equifax dispute investigation dated April 14, 2022, concluded that its investigations confirmed that the negative Shellpoint reporting was accurate.

94.     Correspondence from Shellpoint dated April 15, 2022, notes that the account was not delinquent within the past 24 months.

95.     Correspondence from Shellpoint dated May 3, 2022, notes that the account was not delinquent within the past 24 months.

96.     Plaintiffs disputed Experian's incorrect reporting of the Shellpoint mortgage payments in mid-May 2022.

97.     Experian's dispute investigation results dated June 1, 2022 for the Shellpoint account included confirmation of a recent payment of $700.00, 30 days past due for September 2021, and 60 days past due for October 2021.  Despite Plaintiffs' dispute, Experian did not make any changes, corrections, or updates to Plaintiffs' consumer file and failed to mark the Shellpoint account as "disputed".

98.     Correspondence from Shellpoint on June 8, 2022 notes that the account was not delinquent within the past 24 months.

99.     Plaintiffs disputed Equifax, Experian, and Trans Union's incorrect reporting of the Shellpoint mortgage payments in May/June of 2022.

100.    Trans Union, Experian, and Experian initially corrected the negative and incorrect Shellpoint account information, but the inaccurate information later reappeared in Plaintiffs' consumer credit files.

101.    Plaintiffs sent a qualified written requests NewRez LLC d/b/a Shellpoint Mortgage Servicing in November 2022, indicating that Plaintiffs disputed the accounting of applied payments to their account and requesting that it stop reporting the incorrect negative information.

102.    Shellpoint did not respond to Plaintiffs qualified written request.

103.    Defendants have continued to report the derogatory Shellpoint account on the Plaintiffs' credit reports, despite being notified that this information was false.

104.    Plaintiffs have been attempting to resolve these matters with Defendants and their credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

105.    Due to Defendants failure to accurately report Plaintiffs' Shellpoint mortgage, Plaintiffs were disqualified from purchasing two different retirement investment properties in Key West, Florida.

106.     As a result of the inaccurate credit reporting, Plaintiffs have suffered damages, including, but not limited to:

    a.   Loss of retirement and investment properties that were under contract, due to Shellpoint's negative and inaccurate reporting of the Shellpoint forbearance and loan modification to the credit bureaus and included in Plaintiffs' consumer report and mortgage application;

    b.   Loss of ability to use their otherwise good credit;

    c.   Reduction in credit limits and offers, as well as associated higher interest rates due to negative and inaccurate reporting of the Shellpoint loan in Plaintiffs' credit reports;

    d.   Stress and fear associated with damage to their credit and how that may affect their small business because of the false Shellpoint derogatory reporting on Plaintiffs' credit reports;

    e.   Monies lost by attempting to fix their credit, e.g., communication costs, postage for disputes;

    f.   Loss of time attempting to cure the error;

    g.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life; and

    h.   Stress associated with attempting to resolve this matter in the last year.

107.     Defendants Experian, Equifax, and Trans Union willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiffs.

108.    As a result of this conduct, action and inaction of Experian, Trans Union, and Equifax, the Plaintiffs suffered damage by loss of credit, loss of the ability to purchaseand benefit from a credit, reduction in credit scores, loss of an investment property for retirement, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why they lost the ability to benefit from credit.

109.    Further, after the Plaintiffs' disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Experian, Trans Union, and Equifax ignored such information and did not use any human or substantive review to confirmand verify that its procedures were ensuring maximum possible accuracy of the Plaintiffs' credit reports.

110.    Each Defendant furnished multiple consumer reports to third parties containing the inaccurate tradeline information and each Defendant did so after receiving notice of these inaccuracies.

111.    As a result of Experian, Trans Union, and Equifax's violations of 15 U.S.C. § 1681e(b), the Plaintiffs are entitled to recover their actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative their statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

112.    Experian, Trans Union, and Equifax's conduct, actions, and inaction was willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

113.    The Plaintiffs are entitled to recover their costs and attorney's fees from Experian, Trans Union, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n

and/or § 1681o.

**COUNT I**
**Violation of § 1681i of the FCRA**
**Defendants Experian, Trans Union, & Experian**

114.     Plaintiffs realleges and incorporates all other factual allegations set forth in the
Complaint.

115.     Experian, Trans Union, and Equifax willfully violated 15 U.S.C. § 1681i by failing
to delete inaccurate information in the Plaintiffs' consumer file after receiving actual notice of
such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant
information to Plaintiffs' creditors and/or creditors' attorneys; by failing to maintain reasonable
procedures with which to filter and verify disputed information in the Plaintiffs' credit file; and by
relying upon verification from a source it has reason to know is unreliable.

116.     Further, Experian, Trans Union, and Equifax violated Section 1681i by conducting
***no investigation at all***. Section 1681i demands that when Plaintiffs notified each CRA directly of
their disputes, that party-the consumer reporting agency who received the disputes-must
investigate those disputes. The statute does not contemplate someone other than Experian, Trans
Union, and Equifax conducting the investigation.

117.     Equifax and Trans Union used an unrelated third-party, Teleperformance, over
which neither CRA has control, to conduct its investigations. Teleperformance is not, in the words
of the statute, "the [consumer reporting] agency" to whom Plaintiffs disputed. Equifax and Trans
Union violated 1681i on this basis because they sent Plaintiffs' disputes away to acompany that
was not their controlled agent rather than investigating them as required.

118.     Furthermore, Experian used an unrelated third-party, Experian Chile, over which
Experian has no direct control, to conduct its investigations. Experian Chile is not, in the words of

21

the statute, "the [consumer reporting] agency" to whom Plaintiffs disputed. Experian therefore violated 1681i on this basis because it sent Plaintiffs' disputes away to acompany that was not its controlled agent rather than investigating them as required.

119.    As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiffs are entitled to recover their actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative their statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

120.    Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

121.    The Plaintiffs are entitled to recover their costs and attorneys' fees from Experian and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II
### Violation of § 1681s-2(b)(1)(A) and (B) of the FCRA
### Defendant Shellpoint

122.    The Plaintiffs realleges and incorporates the foregoing paragraphs above as if fully set out herein.

123.    Defendant Shellpoint violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of the Plaintiffs' disputes after said disputes were furnished to Shellpoint by Experian, Trans Union, and Equifax.

124.    On one or more occasions within the past two years, by example only and without limitation, Shellpoint violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided to it by Experian, Trans Union, and Equifax.

125.    Based on the way Experian, Trans Union, and Equifax responded to-or did not

respond to Plaintiffs' disputes, representing that Shellpoint had verified the supposed accuracy of its reporting, Plaintiffs allege that Experian, Trans Union, and Equifax did in fact forward the Plaintiffs' dispute via ACDV to Shellpoint.

126.    Shellpoint understood the nature of Plaintiffs' disputes when it received the ACDVs from Experian, Trans Union, and Equifax.

127.    Notwithstanding the above, Shellpoint follows a systematically unlawful process when it receives an ACDV dispute.  Basically, all Shellpoint does is review its own internal computer screens for the account and repeat back to the ACDV system the same information it already has reporting to Experian, Trans Union, and Equifax.

128.    When Shellpoint receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether the information already in its computer system itself is inaccurate.

129.    As a result of Shellpoint's violations of 15 U.S.C. § 1681s-2(b)(1)(A) and (B), Plaintiffs suffered actual damages including but not limited to loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

130.    As a result of Shellpoint's violations of 15 U.S.C. § 1681s-2(b), the Plaintiffs are entitled to recover their actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative their statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

131.    Shellpoint's conduct, action and inaction was willful, and it is liable for actual, statutory and punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative Shellpoint was negligent, entitling Plaintiffs to recovery under 15 U.S.C. § 1681o.

132.    The Plaintiffs are entitled to recover their costs and attorneys' fees from Shellpoint

in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**Violation of § 1681s-2(b)(1)(C) and (D) of the FCRA**
**Defendant Shellpoint**

133.   The Plaintiffs realleges and incorporates the foregoing paragraphs as if fully set out herein.

134.   On one or more occasions within the past two years, by example only and without limitation, Shellpoint violated 15 U.S.C. §1681s-2(b)(1)(C) and (D) by publishing the false information within Plaintiffs' credit files with Experian, Trans Union, and Equifax in response to their disputes without also including a notation that the debt was disputed and by failing to correctly report results of an accurate investigation to Experian and Equifax.

135.   On information and belief, Plaintiffs alleges that Shellpoint rarely if ever adds the notation that the account is disputed when it responds to the e-Oscar ACDVs.

136.   Plaintiffs' disputes were, at minimum, bona fide.

137.   As a result of these violations of 15 U.S.C. § 1681s-2(b)(C) and (D), Plaintiffs suffered actual damages including but not limited to:  loss of credit, loss of investment property for retirement, damage to reputation, embarrassment, humiliation, and other mental and emotion distress.

138.   As a result of Shellpoint's violations of 15 U.S.C. § 1681s-2(b), the Plaintiffs are entitled to recover their actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative their statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

139.   Shellpoint's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Shellpoint was negligent, which entitles Plaintiffs to recover under 15 U.S.C. § 1681o.

140.    Shellpoint was aware of the *Saunders v. Branch Banking & Trust* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiffs' disputes.

141.    On information and belief, Plaintiffs alleges that the procedures followed regarding the Plaintiffs' FCRA disputes through e-Oscar were the procedures that Shellpoint intended its employees or agents to follow.

142.    On information and belief, Plaintiffs alleges that Shellpoint's employees or agents did not make a mistake in the way he or she followed Shellpoint's procedures when he or she received, processed, and responded to Experian and Equifax's ACDVs and did not include any notation that the account was disputed.

143.    On information and belief, the Plaintiffs alleges that Shellpoint has not materially changed its FCRA investigation procedures regarding the notation of a dispute in ACDVs after learning of its failures in this case.

144.    Plaintiffs are entitled to recovery actual damages, statutory damages, punitive damages, costs and attorney's fees from Shellpoint in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

### COUNT IV
### Violation of § 1681s-2(b)(E) of the FCRA
### Defendant Shellpoint

145.    The Plaintiffs realleges and incorporates the foregoing paragraphs as it fully set out herein.

146.    Defendant Shellpoint violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiffs' information after receiving Plaintiffs' disputes from Experian, Trans Union, and Equifax and prior to the commencement of this action. This failure to correct Plaintiffs' information resulted from Shellpoint's failure to investigate as articulated

herein, after Shellpoint received notice of Plaintiffs' disputes from Experian, Trans Union, and Equifax.

147.    As a result of this conduct, action and inaction of Shellpoint, the Plaintiff suffered actual damages, including but not limited to  by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why they lost the ability to benefit from credit.

148.    As a result of Shellpoint's violations of 15 U.S.C. § 1681s-2(b), the Plaintiffs are entitled to recover their actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative their statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

149.    Shellpoint's conduct, action and inaction was willful, it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

150.    The Plaintiffs are entitled to recover their costs and attorneys' fees from Shellpoint in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT V**
**Violation of RESPA, 12 U.S.C. § 2605(e)**
**Defendant Shellpoint**

151.    Plaintiffs realleges and incorporates the foregoing paragraphs as if fully set forth herein.

152.    On one or more occasions within the past two years, by example only and without limitation, Plaintiffs made a qualified written request to Shellpoint insisting that it investigate to correct inaccurate account information, inaccurate credit reporting, inaccurate charges to their

account, and to provide information regarding their loan.

153.    Upon information and belief, Shellpoint continued to report derogatory information to the CRAs including to the CRAs during the 60-day period following its receipt of Plaintiffs qualified written request.

154.    Shellpoint violated the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e), by:

    a.  Failing to timely conduct an appropriate investigation of Plaintiffs' inquiries;

    b.  Failing to conduct any investigation whatsoever regarding Plaintiffs' inquiries;

    c.  Failing to timely provide Plaintiffs with a true and accurate written explanation or clarification of the Plaintiffs' legitimate questions regarding their loan;

    d.  Continuing to report information regarding allegedly overdue payments to the national credit bureaus, including during the 60-day period following its receipt of Plaintiffs qualified written requests.

155.    As a result of Shellpoint's violations of 12 U.S.C. § 2605(e), the Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

156.    Shellpoint is liable for actual damages in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f).

157.    Shellpoint's conduct appears to be a pattern and practice of misconduct with many consumers. Plaintiffs are victims of this pattern of misconduct. For each violation of 12 U.S.C. § 2605(e), Shellpoint is also liable to Plaintiffs for additional damages up to $2,000 per violation.

141.    Plaintiffs is also entitled to recover costs and attorneys' fees from Shellpoint in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f)(3).

27

WHEREFORE, Plaintiffs demands judgment for actual, statutory, and punitive damages against Defendant as pleaded above; their attorney's fees and costs; prejudgment and post-judgment interest at the judgment rate; and such other relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**JENNIFER FULWILER**

By:    */s/ Tara Keller*

Tara B. Keller ID 2230
CONSUMER LITIGATION ASSOCIATES, P.C.
6 E. Eager Street
Baltimore, MD 21202
(443) 955-6652 – Telephone
(757) 930-3662 – Fax
Email: tara@clalegal.com

Drew D. Sarrett, VSB #81658 *(Pro Hac Vice forthcoming)*
CONSUMER LITIGATION ASSOCIATES, P.C.
626 E. Broad Street, Suite 300
Richmond, VA 23219
(804) 905-9900 - Telephone
(757)930-3662 – Fax
Email: drew@clalegal.com
*Counsel for Plaintiffs*